## No. 11,688.

### FREEMAN, ET AL. RECEIVERS v. SCHULZ, ET AL.

Decided May 31, 1927.

Action for death of plaintiffs' parents alleged to have been occasioned by negligence of a railroad company. Judgment for plaintiffs.

### *Affirmed.*

1. APPEAL AND ERROR—*Sufficiency of Evidence.* In an action for death of plaintiffs' parents resulting from a collision of their automobile with a railroad train, evidence reviewed and held to require the submission of the case to the jury.

2. NEGLIGENCE—*Last Clear Chance.* The doctrine of last clear chance does not apply if there is no contributory negligence.

3. *Last Clear Chance.* In Colorado the doctrine of last clear chance is applicable not only to cases of discovered peril, but also to peril that might have been discovered by defendants by the exercise of ordinary care.

4.   RAILROADS—*Automobiles—Instructions.*   Where a backing train collided with an automobile at a railroad crossing resulting in the death of plaintiffs' parents, it is held that there was sufficient evidence to go to the jury as to whether defendant railroad company discovering the peril knew or had reasonable grounds to believe that decedents were unconscious of danger or unaware of the approaching train, warranting an instruction on the doctrine of last clear chance.

*Error to the District Court of the City and County of Denver, Hon. Charles C. Sackmann, Judge.*

Messrs. SMITH & BROCK, Mr. ELMER L. BROCK, Mr. PHILIP W. MOTHERSILL, for plaintiffs in error.

Mr. ROBERT EMMET LEE, for defendants in error.

*Department One.*

MR. JUSTICE SHEAFOR delivered the opinion of the court.

THE defendants in error were plaintiffs in the trial court, the plaintiffs in error were defendants there, and the parties will be so designated here.   Dorothy Louise and Alma Frances Schulz, minors, brought this suit by Kate Smith, their guardian and next friend, against Freeman and Boettcher, as receivers of the Denver & Salt Lake Railroad Company, to recover damages for the death of their parents, Robert Schulz and Alvina Schulz, caused by the alleged negligence of defendants. The complaint contains two causes of action.   Verdict and judgment on each cause of action for $5,000, and defendants bring the case here for review.

The negligence alleged is that on the 18th day of January, 1923, at about the hour of eight o'clock, p. m., at the intersection of West 43rd avenue and Inca street in the city of Denver, Robert Schulz and Alvina Schulz were riding in a Ford automobile, driven and operated

by Robert Schulz, along and upon West 43rd avenue, traveling east, and that then and there the defendants, their agents and employees, improperly, carelessly and negligently drove, managed and operated a railroad train upon the tracks across West 43rd avenue, at approximately right angles thereto, and that the train was there driven into and against the said Ford automobile, in which the said Robert and Alvina Schulz were riding, and that they were, without fault or neglect on their part, then and there run into, over, and upon, and instantly killed by the railroad train.

Defendants deny the allegations of negligence, admit all other allegations, and allege that Robert Schulz was guilty of contributory negligence.

The arguments presented by defendants are: (1) That defendants were not shown by the evidence to have been guilty of the negligence charged, and therefore, the court should have granted defendants' motion for a directed verdict made at the conclusion of all the testimony; and (2) that the doctrine of the last clear chance has no application to this case.

1. As to this contention, it will be necesssary to briefly summarize the evidence to ascertain whether there was sufficient to require submission of the case to the jury on the question of defendants' alleged negligence.

It appears from the evidence that on January 18, 1923, about seven o'clock in the evening, Robert Schulz and Alvina, his wife, left their home on Bryant avenue, in the city of Denver, in a Ford car driven by Robert Schulz, to visit the stock show then in progress at the stockyards. The evidence tended to show that the Schulzes had lived in Denver about two years; that Robert Schulz was not very familiar with Denver streets; that he was the owner of the Ford car; that Mrs. Schulz had no interest therein and never drove it; that the night was very foggy and dark, and that Robert Schulz was always a careful driver.

It was admitted that on that evening, about eight o'clock, at or near the intersection of West 43rd avenue and Inca street, in the city of Denver, the Schulzes were riding in their car, driving along and upon West 43rd avenue, traveling east towards the stockyards, and that defendants' railroad train ran into and collided with the car in which the Schulzes were riding, and that they were instantly killed as a result of the collision; that the train, at the time of the collision, was proceeding in a southerly direction towards the city of Denver, on Inca street; that there were 17 freight cars attached to the front end of the locomotive; that the locomotive was at the rear end of the 17 cars, pushing them in towards Denver, over the crossing at West 43rd avenue, at the time of the collision and where it occurred, and that there was no headlight on the front end of the freight car which struck the Schulz car.

Finley, sergeant of police, testified he was called that evening about eight o'clock to the accident at 43rd avenue and Inca street; that he there saw the bodies of the Schulzes; that it had been raining earlier in the evening, and that it was a dark night; that there were no lights on 43rd avenue, nor on Inca street, near the scene of the accident; that it was about four or five blocks from the place of the collision to an arc light; that West 43rd avenue was a through street in that part of the city, a street one would be likely to travel in going from the Schulz home to the stockyards; that the stock show was on at the time and that the road was much traveled; that practically all of the people of North Denver use that road to go to the stockyards; that there was no gong or anything that would indicate there was a railroad crossing there, and no light nor sign; the witness further testified: "They had the train broke and there was seven cars on this side of the crossing, and the other ten cars were on the other side of the crossing; that is, of the road. The seven cars were over the crossing towards Denver, in the direction in which the train

had been going. I found Mr. Schulz under the fifth car, and under the sixth car was Mrs. Schulz. They were both dead at that time. I found the Ford automobile on this side of the track some feet away under the first car. The automobile was all smashed. The cut starts at 44th and runs down; it is, I imagine, about ten or twelve feet high, * * *. It starts at 44th and heads down into 43rd. A car traveling easterly towards the stockyards on West 43rd would be on the right of this train as it was pushing into Denver. The train would be coming from the driver's left. There was no headlight on the cars that were first heading in towards Denver, as the train was being pushed.''

On cross-examination the witness testified: ''I am fairly familiar with that crossing. There is no gong or any light at the C. & S. tracks near by. I imagine the C. & S. crossing is about 20 feet from the Moffat Road track. There are several tracks at the C. & S. crossing—five or six—and there is no light or gong there. Immediately to the east there are some railroad tracks. There is no light or gong there. There was no light on the end car—the car which was nearest to the Moffat station— when I got there. I don't know what lights were on that car at the time of the accident.''

. The evidence further showed that just before the accident two other automobiles immediately preceded the Schulz car as they were approaching the crossing.

Fred Crissman, an employee of defendants, testified that he was present at the time of the collision; that the train was being pushed into Denver by a locomotive at the rear end of the train; that the train was 17 freight cars in length; that each freight car was about 40 feet in length; that there was a headlight on the locomotive; that the locomotive was pushing the cars headed for Denver; that there were three lights on the 17 freight cars, and they were the lights that the switchmen handled; that Mr. Martin was on the train with a hand lamp; that Finn and himself on the forward car with hand lights;

that he and Finn were on the farthest car from the engine, the 17th car; that that was the car to strike the automobile in which the Schulzes were riding; that they were within a few feet of the end of the car; that there were no stationary lights on the front end of the car that first struck the Schulzes, no lights but the two that Finn and he carried; that there was no person on the ground signaling to persons who would be making the crossing; that there was nobody on the ground giving signals of any kind to motorists or anybody attempting to cross; that there was no other signal at any time and place from the front end of the car except the lanterns held by Finn and himself, which were ordinary lanterns; that he could not say whether the bell on the engine was ringing at that time or not because, as a rule, it was always ringing when the engine was in motion; that he did not remember hearing the bell ringing; that the whistle was sounded twice, that is, a crossing signal was sounded twice; that was when the front car was about eight hundred or a thousand feet from the crossing; that the engine would be that distance from the cars; that the whistle was blown at two different times when they were getting pretty close to the crossing. The witness then said: "I would say from the top of that car on which Mr. Finn and I were down to the ground was about thirty feet. They were very big cars, one of the largest cars the Union Pacific has."

The witness, when called to testify in behalf of the defendants, further testified: "I observed these automobiles as they approached the railroad tracks. When I first observed them, the first one, I expect, was in the neighborhood of about 100 or 150 feet from the crossing. The two forward ones was pretty close together; I will say 75 or 100 feet; they were close together. I observed these cars as they approached the crossing. The foremost one, I expect they was going probably thirty-five or forty miles an hour. They were traveling right along. When the third car showed up to our sight, why he was

quite a ways back of the two foremost cars, and it appeared to me like he was traveling much faster than the two forward ones, because you could see where he was gaining, or closing in on them. The speed of the two foremost cars was possibly thirty-five to forty miles an hour. I am satisfied the Schulz car was traveling faster than the two forward ones, because that was the first thing that entered my mind, was the speed he was coming down the hill. No, I did not observe any change in the speed of the Schulz car as it approached the track. * * * I would say the train was moving, prior to the accident, eight miles an hour."

Herbert Finn, called as a witness on behalf of defendants, testified that he was engine foreman on the date of the collision; that he was on the lead or head car, about six feet from the head end of the car; that Crissman was with him and Martin was on the 4th car from the engine; that he had a lantern at the time of the accident, which was in his hand and lighted; that it was a white standard light. Then the witness said: "When I first observed the automobile there was three cars together coming down, going east on 43rd. They was twenty-five or thirty feet apart when they came down the hill. They was about two blocks away when I first observed them. At that time I was along about 44th. The speed of the train at the time of the accident and just before, was six or eight miles an hour. * * * I hollered at the top of my voice when approaching 44th and seeing these cars—give warning. I was hollering all the way, full block. Mr. Crissman and I were both hollering. The two cars got by, and as this Ford approached he speeded up his engine and got on the crossing at the time we got there. This last car was the one in which the Schulzes were riding. It was the last of the three. The other two cars had gotten across. This Schulz car was about twenty-five or thirty feet from the track when it speeded up. There were lights on the automobile; on all three of the cars. The train came to

a stop there at the crossing by me giving a signal. It was given right immediately, when I saw that we was going to strike, I gave that signal with the usual stop sign, a full swing of the hand with the lantern. The train stopped promptly upon the giving of that signal. Yes, I drive an automobile myself, and have driven about eight years. Yes, I observed these cars from the time I first saw them at about 44th. The rate of speed of this Ford automobile was twenty-five or thirty miles an hour. Both Mr. Crissman and I were standing up at the time, with the lanterns in our hands. The breaking apparatus on the train was in perfect condition.''

On cross examination he further testified: ''Yes, I said that I hollered at the top of my voice all the way from 44th to approximately the moment of the collision. I was hollering to warn these people in the three machines, that were crossing, or were going to cross the path of the train. * * * I was at 44th when I started to shout, and I continued to shout until I got to the point of the collision. When I was at 44th the three cars were all going in an easterly direction. * * * That car went about six car lengths after I gave the signal before it stopped. That would be about 240 or 250 feet. I gave the signal as soon as the collision happened. I gave the signal right after we came up to the crossing. I gave the signal just about the same time they got on the crossing.

''Q. How far was the car that Schulz was driving from the front end of the head car when you gave the signal? A. He was right on to it.''

Of course, there was much other testimony in the case but, for our purpose here, it is unnecessary to set forth the evidence at greater length. It is apparent that this evidence was ample to require the submission of the case to the jury, and it would have been error to have sustained the motion for a directed verdict.

2. As to this proposition, it was doubtless because of the testimony which we have quoted, and possibly some

other evidence in the case, that the court gave instructions 6 and 10, relating to the last clear chance, of which defendants complain. It will be observed that the Schulz car and two others immediately preceding it were coming down the hill and were observed by the two men having lanterns in their hands on the first or seventeenth car, when they were at about 44th street, and that they began shouting to the parties in the automobiles for the purpose of attracting their attention and warning them of the approaching danger; that the two men continued to shout for the full block, from 44th to 43rd avenue, where the collision occurred. One of these witnesses testified that the first two automobiles were traveling about thirty-five or forty miles an hour; that the Schulz car was quite a distance to the rear of the first two, and running at a much greater speed, and that he did not notice any change in the speed of the Schulz car as it came down the hill to the crossing. The other witness testified that the three cars were running about thirty or forty miles an hour and that the Schulz car speeded up as it approached the crossing. Finn testified: ''I saw the accident. When I first observed the automobile there was three cars together coming down, going east on 43rd. They was twenty-five or thirty feet apart when they came down the hill. They was about two blocks away when I first observed them. At that time I was along about 44th.''

As suggested in defendants' brief, if there was no contributory negligence on the part of the decedents, then the doctrine of last clear chance would not apply. *Campion v. Eakle,* 79 Colo. 320, 327, 246 Pac. 280, 47 A. L. R. 289.

In the instant case, however, there was evidence of contributory negligence on the part of the decedents, or one of them at least, sufficient to require submission of that question to the jury. The defendants' position on this question is: ''That the last clear chance doctrine has no place in connection with any crossing case, unless

there are peculiar circumstances involved. For example, if the automobile stalls on the track, and this is appreciated in time by the engineer, it is his duty to stop the train. * * * The reason for the rule is absent in the ordinary crossing case, because it cannot be said that the employees in charge of a train appreciate any position of peril on the part of the automobile driver until the very instant of the collision. * * * Engineers operating trains see automobiles approaching at practically all crossings. They assume, as they have a right to assume, that they will slow down and stop before reaching a position of peril. No position of peril is, in fact, reached in any of these cases until they are on the track, or so close to it that it becomes obvious that they are not going to stop," and then it is too late to avoid the accident. Among the cases cited in support of their position are, *St. Louis & S. F. R. Co. v. Summers,* 173 Fed. 358; *Allnutt v. Missouri Pacific R. Co.,* 8 Fed. (2d) 604. The doctrine of these two cases seems to be this: "First. The exception (the last clear chance rule) does not apply where there is no negligence of the defendant supervening subsequently to that of the plaintiff, as where his negligence is continuous and operative down to the moment of the injury." "Second. The exception does not apply where the plaintiff's negligence or position of danger is not discovered by the defendant in time to avoid the injury."

The decisions of this court have not been in harmony with those cited. In *Colorado & S. Ry. Co. v. Western L. & P. Co.,* 73 Colo. 107, 214 Pac. 30, this court said: "On the issue, as to the doctrine of last clear chance, plaintiff's criticisms of the instructions given are based largely upon its mistaken supposition that that doctrine applies only in cases where peril has actually been discovered. Some federal and some state courts thus limit the application of the doctrine, but since the case of *Denver & Rio Grande R. R. Co. v. Buffehr,* 30 Colo. 27, 69 Pac. 582, this court has consistently applied the doc-

trine not only to discovered peril, but has extended it to peril that might have been discovered by the exercise of ordinary care. One of our latest cases is *Union Pacific R. R. Co. v. Larson*, 66 Colo. 15, 178 Pac. 573.''

Notwithstanding the distinctions sought to be drawn between the instant case and the Larson case, supra, we think the latter is decisive of the question here. We quote from that opinion: ''The testimony on behalf of the defendant shows the speed of the engine was not more than eight or ten miles an hour, and that it could have been readily and easily stopped. That the employees of defendant saw plaintiff and his peril in ample time to have avoided the accident, but called or whistled to him as a warning, instead of stopping the engine. Upon these facts the doctrine of the last clear chance was plainly presented and the instruction applicable thereto was properly given.''

We think the principle there announced is applicable to the situation here, notwithstanding that the facts are not precisely the same in the two cases.

In the circumstances of this case, keeping in mind that the train was backing in the manner shown, there was sufficient evidence to go to the jury as to whether the defendants, after discovering the peril in which decedents were apparently placing themselves, knew, or had reasonable grounds to believe, that decedents were unconscious of danger or unaware of the approaching train.

We are therefore of the opinion that the court did not err in giving the instructions complained of, and that its judgment should be affirmed.

Affirmed.

MR. CHIEF JUSTICE BURKE, MR. JUSTICE WHITFORD and MR. JUSTICE DENISON concur.