Robert E. DeWEESE, Plaintiff,

v.

UNITED STATES of America, Defendant
and Third-party Plaintiff,

v.

METRO COMMUTER AIRLINES, INC.,
et al., Third-party Defendants.

J'Ette Marie FRIZZELL and Alva
Jolyn Faull, Plaintiffs,

v.

BEECH AIRCRAFT CORPORATION and
the United States of America,
Defendants.

No. MDL–88–1.
Civ. A. Nos. C–3097, C–3799.

United States District Court,
D. Colorado.

Aug. 12, 1974.

See also, D.C., 419 F.Supp. 170.

148

Kenneth N. Kripke, Denver, Colo., Lundy, Butler, Wilson & Hall by John L. Butler, Eldora, Iowa, for plaintiffs, in No. C–3097.

Mark A. Dombroff, Dept. of Justice, Washington, D. C., for defendant, in No. C–3097.

Renner & Goss by Paul D. Renner, Denver, Colo., for third-party defendants, in No. C–3097.

Law Offices of Floyd A. Demanes by Joseph E. Russell, Burlingame, Cal., Johnston & Hetherington, Denver, Colo., for plaintiffs, in No. C–3799.

Bronson, Bronson & McKinnon by Lawrason Driscoll, San Francisco, Cal., and Weller, Friedrich, Hickisch & Hazlitt, by W. Robert Ward, Denver, Colo., for defendant Beech.

Mark A. Dombroff, Department of Justice, Washington, D. C., for defendant United States.

## MEMORANDUM OPINION

WINNER, Judge.

*Deweese v. United States* was originally filed in this court. *Frizzell v. United States* was filed in the United States District Court for the Northern District of California, and venue was changed to Colorado. Each of these cases was handled through completion of discovery procedures as a multi-district case [MDL–88–1] in conjunction with *Reisinger v. United States,* filed in the United States District Court for the Northern District of Iowa, and *Vesey v. United States,* filed in the United States District Court for the Central District of California. The two cases in this district were consolidated for trial on the issue of liability, and, during the course of the trial, on plaintiffs' motion, the single action against Beech Aircraft Corporation was dismissed with prejudice. This, then, left the cases as Federal Tort Claims actions, and it is under the Federal Tort Claims Act [28 U.S.C. § 1346 et seq.] that the Court has jurisdiction. Trial and post trial briefs total almost 400 pages, and decision of the cases has been forced to await preparation of a reporter's transcript and the filing of the many briefs, but at long last the cases are ready for determination. As Federal Tort Claims Act cases, trial was of course to the Court, and this memorandum opinion contains the findings, and conclusions required by Rule 52.

On October 3, 1969, Metro Commuter Airlines was operating an air taxi service to and from Denver and points in Wyoming.

On that date, James Leonard Faull, the husband of plaintiff Alva Jolyn Faull, was the pilot and Floyd Wayne Frizzell, the husband of plaintiff J'ette Marie Frizzell, was the co-pilot of a Beech Queen Air [Metro 201] operated by Metro Commuter Airlines in its air taxi business. Robert E. Deweese was a fare paying passenger on the flight of Metro 201 on October 3, 1969. The plane crashed on Lowry Air Force Base while attempting a landing at Stapleton International Airport in Denver. The pilot and co-pilot were killed and, although Deweese survived, he was seriously injured. Plaintiffs claim negligence on the part of the air controllers at Stapleton, and defendant charges negligence, contributory and sole, on the part of the pilot and co-pilot. By third party complaint, defendant asserts a negligence claim against Metro Commuter Airlines, Inc. and its officers in permitting operation of the plane.

Deweese was returning from a hunting trip near Saratoga, Wyoming. He boarded Metro 201 at Rawlins, Wyoming, and, as the sole survivor of the crash, his testimony is of the utmost importance. I adopt the following facts testified to by him. In doing so, I recognize that he is not exactly a millrun plane passenger in that he was employed as a director of Flight Operations, had over 4,000 hours in the air as a pilot and was a licensed commercial pilot. When he boarded the plane, he occupied the third seat on the left hand side of the plane which put him two seats behind the pilot. The plane proceeded to Laramie, Wyoming, in a routine flight, but when it landed at Laramie, the left wheel ran through a puddle of water, and the left engine stopped. The plane remained on the ground for approximately 45 minutes while the crew checked Denver weather and waited for acceptable minimums. Both engines were started without unusual difficulty, and the flight departed for Denver. There were clouds encountered during the trip, but there were no problems until the plane's descent towards Stapleton. During this time, Deweese was monitoring the instruments and observed nothing out of the ordinary. It had been snowing, and while the plane was descending onto Stapleton, the left engine quit. When the plane reached a point estimated by Deweese to be about 300 feet above the ground, power was added to the right engine, (the only engine then functioning) and a left turn was commenced. With his extensive pilot's experience, Deweese concluded that there had been a missed approach, and, realizing the seriousness of the situation, he intensified his observations. The conduct of the pilot and co-pilot he described as having "all appearances [of] professional bravery." The testimony of Deweese continued:[1]

"Q. Now, did there come a time when you saw the ground?

A. Yes.

Q. Will you tell us about that?

A. Shortly after the power had been attempted to be added to the right engine and the plane began a gradual left turn, shortly after that time, I became aware that they were contact (sic) and this is the first time on the approach that I became aware of being in contact. I saw snow on the ground, and it appeared to be a field, an open field, an open field with some terrain. The aircraft—

Q. You were looking out that same left window?

A. Still looking out the left window, yes.

Q. All right.

A. We continued in these conditions of no precipitation, no clouds. We were completely (in) contact, had good visible contact with the ground, and the next thing I noticed was an airport on my left.

Q. Can you orient yourself, then, in what direction were you going then?

---

1. The significance of the testimony becomes more important when compared with the transcript of the taped conversations between the plane and the tower and when compared with the map, both of which appear later in this opinion.

A. At this time were going in a southerly direction.

Q. And with reference to this airport you saw, what side of it were you on?

A. We were on the right side of it.

Q. It would be the west side of the airport?

A. That's right.

Q. —heading south

A. Yes.

Q. —or generally southerly?

A. Generally southerly.

Q. What did you observe, if anything, about that airport?

A. Well, I could see the runways, and I could see 'X's' on the end of the runways.

Q. What does that mean?

A. That means that the field is closed.

Q. All right. Go ahead and tell us what else you observed.

A. I don't remember observing anything other than runways and the 'X's' on them.

Q. All right, what's the next thing that occurred?

A. I went back to monitoring the instruments, and either we were in some form of precipitation or clouds again. At this time—let me go back just a moment. When the runways were in sight, I looked around the horizon that was visible to my view, and I noticed there was a jagged ceiling. There were quadrants where the clouds came lower, and it was like a pocket right there where we were. And as we continued, I believe that we entered some part of that jagged ceiling area, and the next I remember coming in contact was just shortly before the crash.

Q. What, if anything, did you observe at that time?

A. I observed what appeared to be power lines in the flight path at a very low altitude—that we were at a very low altitude to the ground at that time.

Q. Like what?

A. Fifty feet.

All right.

A. I was monitoring the instruments very closely at this time, and I noticed the pilot begin to pull back on the stick in reaction to the power lines—what appeared to be power lines that I'd seen. I went back to the instruments and monitored the airspeed falling through a hundred knots and yelled—

Q. Falling through, you mean—

Passing through.

Q. Decreasing from a hundred knots?

A. Decreasing. And I yelled at the crew at this time to watch air speed and maintain VMC, which is the critical single engine control speed—single engine air speed—control speed, and then I heard the stall warning.

Q. Do you remember the last speed reading that you observed?

A. Eighty knots.

Q. Then you heard the stall warning and it was going about 80 knots at that time, is that correct?

A. Yes.

Q. Then what?

A. Then the plane crashed."

The last 24 minutes 21 seconds of the lives of James Leonard Faull and Floyd Wayne Frizzell were recorded on a dramatic tape giving a chronology of communications to and from the plane and the control tower just prior to the crash. The transcript of that tape accurately sets forth those conversations with the caveat that the exclamation, "I'm gonna bust it!" made at 0021:47 is improperly attributed to Metro 201. In fact, that exclamation was made by Gerald Phillips, the AR–2 controller handling the landing of Metro 201. This is established by Phillips' own admission and by voice spectrograph, and the transcript incorrectly attributes the frightened and

somewhat inculpatory statement to Metro 201.

By way of introduction to the tape, a glossary is in order:

| | |
|---|---|
| AR-2 | Denver TRACON, Arrival Radar Position No. 2. |
| FORT 40 | Air Force T-29, Fort 40. |
| MET 201 | Metro Commuter Airlines Flight 201. |
| CAL 39 | Continental Airlines Flight 39. |
| UAL 163 | United Air Lines Flight 163. |
| WAL 475 | Western Air Lines Flight 475. |
| AR-2 (I) | Denver Arrival Radar Interphone. |
| UAL 695 | United Air Lines Flight 695. |
| BKF GCA | Buckley Air National Guard - GCA |

Also, it should be explained that Metro 201 was intended to land on Stapleton runway 26–L, which, of course, is a runway having a heading of 260 degrees; that the cross runway at Stapleton, runway 35, has a heading of 350 degrees, which is the same heading as a Lowry runway,[2] and the Lowry runway is some two and one-half to three miles south and one-fourth mile west of Stapleton runway 35. For purposes of orientation with the map, Metro 201 was estimated to be just east of Fitzsimons General Hospital at the time of the 0018:46 message and just north of that hospital at 0019:11. Its position at 0019:11 is shown on the map. The transcript follows:[3]

| TIME (GMT) | IDENT | TRANSMISSION |
|---|---|---|
| 2358:10 | FORT 40 | DENVER APPROACH, FORT FOUR ZERO, LEVEL AT ONE ONE |
| | AR-2 | ROGER |
| 2358:39 | MET 201 | DENVER APPROACH, METRO TWO ZERO ONE |
| 2358:42 | AR-2 | METRO TWO ZERO ONE, DENVER APPROACH CONTROL, RADAR CONTACT, TWENTY MILES NORTHWEST OF THE DENVER OMNI, FLY HEADING ONE THREE ZERO AT ONE ONE THOUSAND, VECTOR TO TWENTYSIX FINAL APPROACH COURSE, WEATHER, INDEFINITE, FOUR HUNDRED, SKY OBSCURED, VISIBILITY THREE QUARTER MILE, SNOW AND FOG, RUNWAY VISUAL RANGE, THREE THOUSAND SIX HUNDRED |
| | MET 201 | OK, THAT'S ONE TWO ZERO AND ELEVEN THOUSAND |
| | AR-2 | THAT'S ONE THREE ZERO |
| 2359:12 | MET 201 | ONE THREE ZERO |

2. The Conoco roadmap included in this opinion seems to be in error on some of the runway headings.

3. Times shown are Greenwich standard time which, of course, is seven hours later than Mountain Time.

| TIME (GMT) | IDENT | TRANSMISSION |
|---|---|---|
| 2359:23 | CAL 39 | DENVER, CONTINENTAL THIRTYNINE, WITH YOU, LEVEL ONE TWO THOUSAND |
| | AR-2 | CONTINENTAL THIRTYNINE, DENVER APPROACH CONTROL, RADAR CONTACT FOUR WEST OF BYERS, SLOW TO TWO HUNDRED AND TWENTY KNOTS, DESCEND AND MAINTAIN EIGHT THOUSAND |
| | CAL 39 | ROGER, SLOWING TO TWO HUNDRED TWENTY, DESCENDING TO EIGHT THOUSAND, CONTINENTAL THIRTYNINE |
| | AR-2 | CONTINENTAL THIRTYNINE, WEATHER, INDEFINITE, FOUR HUNDRED, SKY OBSCURED, THREE QUARTER OF A MILE IN LIGHT SNOW AND FOG, RUNWAY VISUAL RANGE NOW THREE THOUSAND FOUR HUNDRED |
| | CAL 39 | CONTINENTAL THIRTYNINE, ROGER |
| 0000:57 | AR-2 | METRO TWO ZERO ONE, TURN RIGHT, HEADING ONE SEVEN ZERO |
| 0001:03 | MET 201 | TWO OH ONE, RIGHT, ONE SEVEN ZERO |
| 0001:12 | UAL 163 | DENVER APPROACH, UNITED ONE SIXTYTHREE, AT TWELVE THOUSAND |
| | AR-2 | UNITED ONE SIXTYTHREE, DENVER APPROACH CONTROL, RADAR CONTACT TWO EAST OF BYERS, DESCEND TO EIGHT THOUSAND, WEATHER, INDEFINITE FOUR HUNDRED, SKY OBSCURED, THREE QUARTER MILE IN SNOW AND FOG, RUNWAY VISUAL RANGE, THIRTYTWO HUNDRED FEET |
| | UAL 163 | UNITED ONE SIXTYTHREE, LEAVING TWELVE THOUSAND FOR EIGHT THOUSAND, YOU HAVE A TERRIFIC BACKGROUND NOISE |
| | AR-2 | I HAVE A WHAT? |
| | UAL 163 | GREAT DEAL OF BACKGROUND NOISE |
| | AR-2 | WELL, NOT MUCH I CAN DO ABOUT IT, I'M WEARING A NOISE CANCELLER, IT, UH, IS PROBABLY A LITTLE NOISY THOUGH |
| | UAL 163 | IT'S BETTER NOW |
| 0002:03 | AR-2 | CONTINENTAL THIRTYNINE, CLEARED I L S, TWO SIX LEFT APPROACH, YOU'RE TWELVE MILES EAST OF MARKER, SPEED AND ALTITUDE NOW |

| TIME (GMT) | IDENT | TRANSMISSION |
|---|---|---|
| 0002:03 | CAL 39 | CONTINENTAL THREE NINE, ROGER, OUT OF NINE THOUSAND SIX, AND WE'RE HOLDING TWO TWO ZERO ON SPEED, CLEARED FOR THE TWO SIX LEFT |
|  | AR-2 | OK, UH, TWO TWENTY'S FINE, RUNWAY VISUAL RANGE'S THREE THOUSAND TWO HUNDRED |
|  | CAL 39 | THIRTYNINE, ROGER |
| 0002:35 | AR-2 | UNITED ONE SIXTYTHREE, REDUCE SPEED TO TWO HUNDRED AND FIFTY KNOTS |
|  | UAL 163 | ONE SIXTYTHREE, REDUCING TO TWO FIVE ZERO |
| 0002:46 | AR-2 | FORT FOUR ZERO, TURN RIGHT, HEADING ONE FIVE ZERO |
|  | FORT 40 | FORT FOUR ZERO, RIGHT, ONE FIVE ZERO |
| 0003:39 | AR-2 | METRO TWO ZERO ONE, TURN RIGHT, HEADING ONE NINER ZERO |
|  | MET 201 | TWO OH ONE, RIGHT TO ONE NINE ZERO |
|  | AR-2 | UNITED ONE SIXTYTHREE, SLOW NOW TO TWO HUNDRED KNOTS |
|  | UAL 163 | ONE SIXTYTHREE, SLOWING TO TWO HUNDRED |
|  | AR-2 | CONTINENTAL THIRTYNINE, MONITOR THE TOWER, REPORT OVER OUTER MARKER ON ONE EIGHTEEN THREE |
|  | CAL 39 | THIRTYNINE, EIGHTEEN THREE, GOOD DAY SIR |
|  | AR-2 | GOOD DAY |
| 0004:15 | WAL 475 | DENVER APPROACH, WESTERN FOUR SEVENTYFIVE'S AT ONE ONE THOUSAND |
|  | AR-2 (I) | HEY DODGE, THAT (GARBLE) SEVENTEEN NORTH THERE |
|  | ? | OK |
|  | AR-2 | WESTERN FOUR SEVENTYFIVE, DENVER APPROACH CONTROL, RADAR CONTACT, MAINTAIN ONE ONE THOUSAND, HEADING ONE EIGHT ZERO, VECTOR TO TWO SIX FINAL APPROACH COURSE |
|  | WAL 475 | ROGER, MAINTAIN ONE ONE THOUSAND, HEADING ONE EIGHT ZERO, FOUR SEVENTYFIVE |

| TIME (GMT) | IDENT | TRANSMISSION |
|---|---|---|
| 0004:15 | AR-2 | UNITED ONE SIXTYTHREE, SLOW TO ONE SIX ZERO KNOTS |
| | UAL 163 | ONE SIXTYTHREE, SLOWING NOW TO ONE SIX ZERO |
| 0004:59 | AR-2 (I) | DODGE? |
| | ? | YES |
| | AR-2 (I) | OVER THE QMNI, HE'S GONNA STAY AT ELEVEN INTO THE KIOWA GATE FOR A G C A |
| | ? | ALL RIGHT |
| 0005:09 | AR-2 | I MISSED THE LAST CALL, SAY IT AGAIN |
| | AR-2 | UNITED ONE SIXTYTHREE, SPEED AND ALTITUDE RIGHT NOW |
| | UAL 163 | WE'RE AT EIGHT THOUSAND, AND, UH, ONE FIVE FIVE |
| | AR-2 | A HUNDRED AND FIFTYFIVE KNOTS, OK, YOU'RE CLEARED FOR THE APPROACH, AND WILL YOU HOLD THAT, UH, SPEED TIL THE OUTER MARKER, TEN MILES AHEAD? |
| | UAL 163 | ROGER, ONE FIVE FIVE TO THE MARKER |
| 0006:15 | AR-2 | WESTERN FOUR SEVENTYFIVE, SLOW TO TWO HUNDRED AND TWENTY KNOTS |
| | WAL 475 | WESTERN FOUR SEVENTYFIVE, SLOWING TO TWO HUNDRED AND TWENTY KNOTS |
| 0007:05 | AR-2 | WESTERN FOUR SEVENTYFIVE, REDUCE SPEED TO ONE EIGHT ZERO KNOTS |
| | WAL 475 | ROGER, WESTERN FOUR SEVENTYFIVE, REDUCING SPEED TO ONE EIGHT ZERO NOW |
| 0007:13 | AR-2 | METRO TWO ZERO ONE, TURN LEFT, HEADING ONE FIVE ZERO |
| | MET 201 | TWO ZERO ONE, LEFT ONE FIVE ZERO, ROGER |
| 0007:29 | AR-2 | RUNWAY VISUAL RANGE NOW DOWN TO THREE THOUSAND FEET, DOES EVERYBODY HAVE MINIMUMS? |
| | ? | THREE THOUSAND'S GOOD FOR US |
| | UAL 163 | ONE SIXTYTHREE, AFFIRMATIVE |

| TIME (GMT) | IDENT | TRANSMISSION |
|---|---|---|
| 0007:41 | AR-2 | OK, ONE SIXTYTHREE, TOWER ONE EIGHTEEN THREE |
|  | UAL 163 | SO LONG |
| 0008:05 | AR-2 | UNITED ONE SIXTYTHREE, CORRECTION, UH, ONE SIXTYONE, VERIFY YOUR SPEED |
|  | AR-2 | OK, ONE SIXTYTHREE, VERIFY SPEED |
| 0008:18 | AR-2 | UNITED ONE SIXTYTHREE, DENVER |
|  | AR-2 | WESTERN FOUR SEVENTYFIVE, TURN LEFT, ONE TWO ZERO |
|  | WAL 475 | WESTERN FOUR SEVENTYFIVE, LEFT, ONE TWO ZERO |
| 0008:44 | AR-2 | MET, CORRECT THAT, FORT FOUR ZERO, DESCEND TO EIGHT THOUSAND |
|  | FORT 40 | ROGER, FORT FOUR ZERO, LEAVING ELEVEN FOR EIGHT, MAINTAINING HEADING ONE, UH, FIVE ZERO |
|  | AR-2 | ROGER, TURN LEFT, HEADING ONE THREE ZERO |
|  | FORT 40 | ROGER, GOING LEFT, ONE THREE ZERO, FORT FOUR ZERO |
| 0009:00 | AR-2 | METRO TWO ZERO ONE, DESCEND, MAINTAIN EIGHT THOUSAND |
|  | MET 201 | UH, TWO ZERO ONE'S OUT OF ONE ONE THOUSAND FOR EIGHT |
| 0009:55 | AR-2 | WESTERN FOUR SEVENTYFIVE, VERIFY THAT YOU ARE LEVEL ONE ONE THOUSAND |
|  | WAL 475 | AFFIRMATIVE, ONE ONE THOUSAND, FOUR SEVENTYFIVE |
|  | AR-2 | ROG |
| 0010:03 | AR-2 | METRO TWO ZERO ONE, TURN LEFT, HEADING ZERO FIVE ZERO |
|  | MET 201 | LEFT ZERO FIVE ZERO, TWO OH ONE, ROGER |
|  | UAL 695 | UNITED SIX NINETYFIVE, TWELVE THOUSAND |
| 0010:16 | AR-2 | METRO TWO ZERO ONE, YOUR ALTITUDE NOW, AND RATE OF DESCENT |

| TIME (GMT) | IDENT | TRANSMISSION |
|---|---|---|
| 0010:20 | MET 201 | UH, A THOUSAND FEET A MINUTE, AND WE'RE OUT OF TEN |
| | AR-2 | OK |
| | AR-2 | UNITED SIX NINETYFIVE, RADAR CONTACT, DESCEND AND MAINTAIN ONE ZERO THOUSAND, AND EXPECT VECTORS FOR SPACING, SPEED TWO HUNDRED, CORRECTION, ONE EIGHT ZERO KNOTS |
| | UAL 695 | UNITED SIX NINE FIVE, CLEARED TO TEN THOUSAND, SPEED SET ONE EIGHT ZERO |
| | AR-2 | ROGER |
| 0010:45 | AR-2 | METRO TWO ZERO ONE, UH, WE'VE GOT A PROBLEM HERE, AND A HOLE HAS DEVELOPED, UH, COULD YOU INCREASE THAT RATE OF DESCENT? |
| | MET 201 | UH, WE'VE GOT PASSENGERS ON BOARD, SIR, WE DON''T HAVE THE PRESSURIZATION, WE CAN GIVE YOU A INCH MORE, BUT THAT'D BE ALL |
| 0011:01 | AR-2 | OK, UH, DON'T PUSH IT THEN, TURN RIGHT, HEADING ZERO SEVEN ZERO |
| 0011:04 | AR-2 | WESTERN FOUR SEVENTYFIVE, UH, STANDBY JUST A MOMENT |
| 0011:09 | AR-2 | METRO TWO OH ONE, ALTITUDE? |
| | MET 201 | UH, WE'RE NINE THREE OUT |
| | AR-2 | OK |
| 0011:17 | AR-2 | WESTERN FOUR SEVENTYFIVE, TURN LEFT, HEADING OF ZERO SEVEN ZERO |
| | AR-2 | UNITED SIX NINETYFIVE, TURN RIGHT, NOW, HEADING THREE ZERO ZERO |
| 0011:31 | AR-2 | UNITED SIX NINETYFIVE, TURN RIGHT, NOW, HEADING THREE ZERO ZERO, THERE'S TRAFFIC HEAD ON |
| | UAL 695 | SIX NINETYFIVE, RIGHT THREE ZERO ZERO |
| | AR-2 | FORT FOUR ZERO, ALTITUDE? |
| | FORT 40 | FORT FOUR ZERO, EIGHT DECIMAL FOUR, DESCENDING TO EIGHT |
| | AR-2 | ROGER |

| TIME (GMT) | IDENT | TRANSMISSION |
|---|---|---|
| 0012:03 | AR-2 | WESTERN FOUR SEVENTYFIVE, DESCEND AND MAINTAIN ONE ZERO THOUSAND, REPORT OUT OF ELEVEN |
| | WAL 475 | ROGER, FOUR SEVENTYFIVE OUT OF ELEVEN |
| | AR-2 | ALL RIGHT |
| 0012:14 | AR-2 | METRO TWO ZERO ONE, TURN RIGHT, MAKE A CIRCLE TO YOUR RIGHT, ROLL OUT HEADING ZERO SEVEN ZERO |
| | MET 201 | UH, THREE SIXTY TO THE RIGHT, ZERO SEVEN ZERO, ROGER |
| | AR-2 | ROGER |
| | AR-2 | WESTERN FOUR SEVENTYFIVE, TURN RIGHT, HEADING TWO THREE ZERO, I'M GONNA HAVE TO PUT YOU ON A DEVIOUS VECTOR HERE |
| | FORT 40 | FORT FOUR ZERO'S AT EIGHT THOUSAND, ONE THREE ZERO |
| | WAL 475 | RIGHT TWO THREE ZERO, WESTERN FOUR SEVENTY-FIVE |
| | AR-2 | FORT FOUR ZERO, TURN RIGHT, HEADING THREE ONE ZERO |
| | FORT 40 | FOUR ZERO, RIGHT THREE ONE ZERO, MAINTAINING EIGHT |
| | AR-2 | ROG |
| | AR-2 | UNITED SIX NINETYFIVE, ALTITUDE? |
| | UAL 695 | SIX NINETYFIVE, TEN THOUSAND |
| | AR-2 | ROG |
| | AR-2 | METRO TWO OH ONE, ALTITUDE? |
| | MET 201 | UH, WE'RE OUT OF EIGHT FIVE, AND, UH, WE GOT, UH, QUITE A BIT OF ICE IN OUR LEFT ENGINE, MIGHT HAVE TO SHUT IT DOWN |
| | AR-2 | SAY IT AGAIN |
| 0012:57 | MET 201 | UH, OUR LEFT ENGINE'S ICED UP, UH, WE CAN'T CONTINUE ANY LONGER ON THAT LEFT ENGINE |

| TIME (GMT) | IDENT | TRANSMISSION |
|---|---|---|
| 0013:07 | AR-2 | OK, UH, METRO TWO ZERO ONE, FLY HEADING TWO ONE ZERO, A VECTOR TO TWO SIX FINAL APPROACH COURSE, WE'LL GET YOU RIGHT ON IN HERE |
| | MET 201 | OK, WE'D APPRECIATE IT, THANK YOU |
| | AR-2 | ALL RIGHT |
| | AR-2 | UNITED, UH, SIX NINETYFIVE, WHAT, UH, D M E AND RADIAL DO YOU SHOW RIGHT NOW? |
| | UAL 695 | SIX NINETYFIVE, ZERO EIGHT FIVE, AT, UH, NINETEEN AND A HALF |
| | AR-2 | OK, HOLD AT THE, UH, EIGHTEEN MILE RADIAL, CORRECTION, D M E FIX ON THE RADIAL, ONE MINUTE LEFT TURNS, MAINTAIN ONE ZERO THOUSAND |
| | UAL 695 | UH, YOU, YOU WANT TO HOLD ON THE ZERO EIGHT FIVE RADIAL BETWEEN EIGHTEEN AND WHAT? |
| | AR-2 | BETWEEN EIGHTEEN AND TWENTYFIVE MILES, START YOUR TURN NOW, LEFT TURN |
| | UAL 695 | EIGHTEEN AND TWENTYFIVE, STARTING LEFT TURN NOW |
| 0013:56 | AR-2 | METRO TWO OH ONE, ALTITUDE? |
| 0013:58 | MET 201 | WE'RE AT EIGHT |
| 0014:00 | AR-2 | OK, UH, YOU'RE TEN MILES FROM THE AIRPORT, TURN RIGHT, HEADING TWO THREE ZERO |
| | MET 201 | RIGHT, TWO THREE ZERO, ROGER |
| | FORT 40 | FORT FOUR ZERO'S, UH, STEADY THREE ONE ZERO, AT EIGHT |
| | AR-2 | FORT FOUR ZERO, SQUAWK IDENT, CONTACT BUCKLEY G C A ON THIS FREQUENCY |
| | FORT 40 | FORT FOUR ZERO, IDENT |
| | BKF GCA | FORT FOUR ZERO, BUCKLEY G C A, HOW DO YOU HEAR ME, OVER |
| | FORT 40 | READ YOU GIVE SQUARE |
| | AR-2 | METRO TWO ZERO ONE, DO YOU HAVE THE LOCALIZER? TURN INBOUND ON IT, PLEASE |

| TIME (GMT) | IDENT | TRANSMISSION |
|---|---|---|
| 0014:00 | MET 201 | OK, WE WILL |
| | AR-2 | HAVE YOU SHUT THE ENGINE DOWN? |
| | MET 201 | IT'S DOWN |
| | AR-2 | ALL RIGHT |
| 0014:49 | AR-2 | WESTERN FOUR SEVENTYFIVE, TURN RIGHT, HEADING ZERO SEVEN ZERO |
| | WAL 475 | RIGHT ZERO SEVEN ZERO, WESTERN FOUR SEVENTYFIVE |
| 0015:06 | AR-2 | METRO TWO ZERO ONE IS, METRO TWO ZERO ONE IS INTERCEPTING THE LOCALIZER, THREE MILES FROM MARKER, TURN INBOUND AND CLEARED FOR THE APPROACH, THE EQUIPMENT'S STANDING BY FOR YOU |
| | MET 201 | OK, THANK YOU SIR |
| 0015:32 | AR-2 | METRO TWO ZERO ONE, DO YOU HAVE THE LOCALIZER? |
| | MET 201 | UH, WE GOT IT |
| | AR-2 | OK, YOU'RE ABOUT A QUARTER MILE SOUTH OF IT, AND, UH, STILL SOUTHWESTBOUND, YOU WANT A SURVEILLANCE APPROACH? |
| | MET 201 | UH, GO AHEAD, GIVE IT TO US |
| | AR-2 | OK, FLY HEADING, UH, TWO SIX FIVE, TWO SIX FIVE IS THE HEADING, MAINTAIN SEVEN THOUSAND, PREPARE TO BEGIN DESCENT IN, UH, TEN SECONDS, TWO SIX FIVE'S THE HEADING |
| 0016:00 | MET 201 | TWO SIX FIVE |
| | AR-2 | WESTERN FOUR SEVENTYFIVE, DEPART THE OMNI ON THE ZERO NINE ZERO RADIAL, AND, EXPECT A TURN AT THE TEN MILE FIX |
| | AR-2 | METRO TWO ZERO ONE, FIVE AND ONE HALF MILES FROM RUNWAY, BEGIN DESCENT TO MINIMUM DESCENT ALTITUDE, FIVE THOUSAND EIGHT HUNDRED AND TWENTY FEET |
| | MET 201 | FIVE THOUSAND EIGHT HUNDRED AND TWENTY, ROGER |

| TIME (GMT) | IDENT | TRANSMISSION |
|---|---|---|
| 0016:00 | AR-2 | UNITED SIX NINETYFIVE, DESCEND AND MAINTAIN NINER THOUSAND, REPORT OUT OF TEN |
| | UAL 695 | UNITED SIX NINER FIVE, OUT OF TEN THOUSAND, TO MAINTAIN NINE |
| 0016:42 | AR-2 | METRO TWO ZERO ONE, TURN RIGHT, HEADING TWO SEVEN ZERO |
| | AR-2 | WESTERN FOUR SEVENTYFIVE, HOLD EAST ON THE, UH, DENVER V O R, ZERO NINE ZERO RADIAL, FIFTEEN MILE FIX, ONE MINUTE, RIGHT TURNS |
| | WAL 475 | ROGER, HOLD EAST DENVER V O R, UH, ZERO NINE ZERO, FIFTEEN MILE, UH, NAUTICAL MILE FIX, FOUR SEVENTYFIVE |
| | AR-2 | ROGER, MAINTAIN ONE ZERO THOUSAND |
| | AR-2 | METRO TWO ZERO ONE, FOUR MILES FROM RUNWAY, TURN RIGHT HEADING TWO SEVEN FIVE, YOU'RE CLEARED TO LAND, RUNWAY TWO SIX LEFT, WIND TWO NINE ZERO DEGREES, FIVE |
| 0017:33 | AR-2 | METRO TWO ZERO ONE, RUNWAY VISUAL RANGE THREE THOUSAND FOUR HUNDRED, TWO SEVEN FIVE THE HEADING |
| | AR-2 | UNITED SIX NINETYFIVE, ARE YOU LEVEL AT NINE THOUSAND? |
| | UAL 695 | SIX NINETYFIVE, LEVELLING NINE THOUSAND |
| | AR-2 | ROGER |
| | AR-2 | METRO TWO ZERO ONE, TURN RIGHT, HEADING TWO EIGHT ZERO, THREE MILES FROM RUNWAY, TWO EIGHT ZERO'S THE HEADING |
| 0018:00 | AR-2 | METRO TWO ZERO ONE IS CLEARED TO LAND, TWO SIX LEFT, WIND CHECK, TWO NINE ZERO DEGREES FIVE, RUNWAY VISUAL RANGE, THREE THOUSAND FOUR HUNDRED, TURN LEFT, HEADING TWO SIX ZERO |
| 0018:13 | AR-2 | TWO SIX ZERO'S THE HEADING, TWO AND ONE HALF MILES FROM RUNWAY |

| TIME<br>(GMT) | IDENT | TRANSMISSION |
|---|---|---|
| 0018:25 | AR-2 | METRO TWO ZERO ONE, TWO MILES FROM RUNWAY, HEADING TWO SIX ZERO, REPORT THE FIELD IN SIGHT, TWO SIX ZERO'S THE HEADING |
| 0018:36 | AR-2 | METRO TWO ZERO ONE, TURN RIGHT, HEADING TWO SIX FOUR, TWO SIX FOUR'S THE NEW HEADING |
| 0018:46 | AR-2 | METRO TWO ZERO ONE, TWO SIX FOUR'S THE HEADING, A MILE AND A HALF FROM RUNWAY, DO YOU HAVE THE AIRPORT IN SIGHT? |
| 0018:52 | MET 201 | NEGATIVE AIRPORT |
| 0018:53 | AR-2 | YOU HAVE THE AIRPORT? |
| 0018:55 | MET 201 | NO AIRPORT |
| 0018:56 | AR-2 | NO AIRPORT, TWO SIX FOUR'S THE HEADING, TURN RIGHT, HEADING TWO SIX SIX |
| 0019:07 | AR-2 | TWO SIX SIX IS THE HEADING |
| 0019:11 | AR-2 | METRO TWO ZERO ONE, CLIMB AND MAINTAIN SEVEN THOUSAND |
| 0019:17 | MET 201 | MISSED APPROACH, CLIMB AND MAINTAIN SEVEN, ROGER |
| 0019:27 | AR-2 | METRO TWO ZERO ONE, ALTITUDE? |
| 0019:29 | MET 201 | UH, FIFTYSIX |
| 0019:33 | AR-2 | OK, FLY YOUR PRESENT HEADING, CLIMB AND MAINTAIN SEVEN THOUSAND |
| 0019:38 | MET 201 | PRESENT HEADING IS TWO FOUR ZERO |
| 0019:40 | AR-2 | OK |
| 0020:00 | AR-2 | METRO TWO OH ONE'S ALTITUDE? |
| 0020:03 | MET 201 | FIFTYSEVEN |
| 0020:05 | AR-2 | OK, HOW'S YOUR ICE? |
| 0020:08 | MET 201 | PRETTY GOOD |
| 0020:10 | AR-2 | OK |

| TIME (GMT) | IDENT | TRANSMISSION |
|---|---|---|
| 0020:24 | WAL 475 | WOULD IT BE POSSIBLE FOR WESTERN FOUR SEVENTYFIVE TO HOLD EAST OF THE, UH, TWENTYFIVE MILE FIX; INSTEAD OF FIFTEEN? |
| | AR-2 | WESTERN FOUR SEVENTYFIVE, JUST A MINUTE, WESTERN FOUR SEVENTYFIVE, GO TO DENVER ON ONE TWO ZERO POINT FIVE |
| 0020:38 | WAL 475 | ROGER |
| 0020:46 | AR-2 | METRO TWO OH ONE, ALTITUDE? |
| 0020:49 | MET 201 | TWO OH ONE, UH, WE'RE AT, UH, FIFTYSEVEN AND DESCENDING AT FIVE HUNDRED FEET A MINUTE |
| 0020:56 | AR-2 | YOU'RE DESCENDING? |
| 0020:58 | MET 201 | ROGER |
| 0020:59 | AR-2 | METRO TWO ZERO ONE IS DESCENDING?  IS THAT CORRECT? |
| 0021:03 | MET 201 | ALL WE CAN HOLD IS ABOUT FIFTYSEVEN HUNDRED, WE'RE PICKING UP A LOT OF ICE |
| 0021:11 | AR-2 | METRO TWO ZERO ONE, TURN RIGHT, HEADING ZERO ONE ZERO |
| 0021:14 | MET 201 | RIGHT, ZERO ONE ZERO, ROGER |
| 0021:20 | AR-2 | METRO TWO, METRO TWO ZERO ONE, MAINTAIN AS MUCH ALTITUDE AS YOU CAN, AND, UH, ARE YOU IN A LEFT TURN NOW? |
| 0021:31 | MET 201 | ROGER |
| 0021:32 | AR-2 | OK, CONTINUE THE LEFT TURN TO HEADING OF THREE FIVE ZERO |
| 0021:38 | AR-2 | WE'LL START AN APPROACH TO RUNWAY THREE FIVE |
| 0021:40 | ? | [background] YOU CAN TURN RIGHT |
| 0021:41 | MET 201 | UH, LOOKS LIKE WE'RE ABOUT TO LOSE IT |
| 0021:44 | AR-2 | OK, LOWRY'S RIGHT THERE BELOW YOU, WHAT IS YOUR ALTITUDE? |
| 0021:47 | MET 201 | I'M GONNA BUST IT |

| TIME (GMT) | IDENT | TRANSMISSION |
|---|---|---|
| 0021:51 | AR-2 | DO YOU SEE LOWRY?  IT'S RIGHT BELOW YOU |
| 0022:03 | AR-2 | METRO TWO ZERO ONE, DENVER |
| 0022:24 | AR-2 | UNITED SIX NINETYFIVE, YOU STILL ON? |
|  | UAL 695 | SIX NINETYFIVE |
|  | AR-2 | OK, UH, WHAT IS YOUR D M E POSITION NOW? |
|  | UAL 695 | UH, EIGHTEEN AND A HALF |
|  | AR-2 | OK |
| 0022:45 | AR-2 | METRO TWO ZERO ONE, DENVER |
| 0023:08 | AR-2 | UNITED SIX NINETYFIVE, SQUAWK IDENT ON ZERO FOUR ZERO ZERO |
|  | UAL 695 | SIX NINE FIVE |
| 0023:35 | AR-2 | UNITED SIX NINETYFIVE, GIVE ME ANOTHER SQAWK |
|  | AR-2 | UNITED SIX NINETYFIVE, TURN, UH, RIGHT HEADING THREE ZERO ZERO, VECTOR TO WATKINS INTERSECTION, WE'LL HAVE TO PUT YOU IN THE HOLDING PATTERN NOW, I GUESS WE'VE LOST ONE. |

A visual portrayal of the plane's flight from the time of the missed approach to the time of the crash appears on Exhibit 84 which shows the flight path reconstructed by the witness McDermott and the flight path reconstructed by Controller Phillips. An approximation of Exhibit 84, greatly reduced in size, follows in this opinion, and I find as fact that the flight path and the times were those testified to by the witness McDermott. His flight path is portrayed by the solid line, and the Controller's projected and intended flight path is shown by the "X's." Of course, there is no argument that the actual flight path was that shown by the solid line, and the only real dispute is as to the position of Metro 201 at 0021–11. The three possible 0021:11 positions are indicated. The # 1 position is McDermott's estimated position at a 100 knot speed (testimony of Deweese). The # 2 position is McDermott's position working backwards from the point of crash at an 80 knot stall speed. The # 3 position is the Controller's estimate. Alameda Avenue is shown by the dotted line.

In further explanation of the map, realization of the missed approach came sometime between 0018:55 and the acknowledgment of the missed approach at 0019:17. It was at this time that Metro 201 went into the published standard missed approach procedure of a gradual left turn to Englewood, and this is the point from which the expert witness Francis McDermott reconstructed the flight path of Metro 201.

It will be remembered that it was at 0021:11, Phillips directed, "Metro two zero one, turn right, heading zero one zero." It is obvious that if the plane was in McDermott's # 1 position a right turn to 010 would take the plane away from Stapleton, away from Lowry, and over a thickly populated section of Denver. If it was at McDermott's # 2 position, a more difficult maneuver would be required of the crippled plane with the same hazardous results. Even if the plane was in Phillips' # 3 position, a right turn to 010, which a one-engined plane couldn't have made as sharply as drawn by Phillips, would have brought the plane perilously close to Colorado Womens College [shown on the map under the College's then name of Temple Buell College] and Phillips acknowledged that the high rise occupied dormitories there were a real hazard to Metro 201 with its inability to maintain altitude. If, when the plane was truly at approximately Colfax Avenue and Yosemite, a left turn to a heading of perhaps 170 had been ordered, hindsight demonstrates that Metro 201 had enough minutes left in the air to make a north to south landing on Lowry runway 17, or, if when the plane was at that point, a right turn to 010 had been directed, a landing on Stapleton's runway 35 might have been accomplished, albeit the problem of Colorado Womens College remained. This latter order is the one Phillips now says he intended, but the difficulty is that the record shows that Metro 201 was far beyond Colfax and Yosemite at 0021.11 when the 010 heading was directed.

Phillips' erroneous positioning of Metro 201 at 0021:11 can be demonstrated mathematically. Phillips and McDermott agree to the plane's position at 0019:11. At a speed of 100 knots, a speed testified to by Deweese, the plane would be at or a little beyond McDermott's 0021:11 # 1 position, and the visual observations of Deweese prior to the crash lend further support to that position. At a speed of 100 knots, Metro 201 crossed Colfax and Yosemite [Phillips' 0021:11 estimated position] at the very time Phillips' attention was distracted by the call from WAL 475, and by his delayed response "Just a minute, Western Four Seventy Five, Go to Denver on One Two Zero Point Five." This is when the 010 heading should have been given, but Phillips was worrying with WAL 475 for "just a minute" at this critical time.

Phillips' 0021:11 position of Metro 201 as shown on Exhibit 84 is hardly consistent with his trial testimony in other respects. His 0021:32 transmission was, "OK, continue the left turn to heading of three five zero." Yet, at time of trial he testified that when this heading was given, Metro 201 "was south of Lowry, south of Alameda." The interval between 0021:11 and 0021:32 wasn't sufficient for the plane to get from Colfax and Yosemite to a point "south of Lowry, south of Alameda." Phillips would have the plane travel in 21 seconds from Colfax and Yosemite to a point "south of Lowry, south of Alameda," when during the 19 second time span of from 0021:32 to 0021:51, he thought it had flown the much shorter distance of from south of Alameda to Lowry. The tape shows:

0021:41　MET 201　UH, LOOKS LIKE WE'RE ABOUT TO LOSE IT.

0021:44　AR-2　OK, LOWRY'S RIGHT THERE BELOW YOU, WHAT IS YOUR ALTITUDE.

0021:47　[AR-2]　I'M GONNA BUST IT.

A casual glance at the map permits no conclusion other than one that Phillips' positioning of the plane at 0021:11 # 3 shown on the map must be erroneous if in fact at 0021:32 Metro 201 "was south of Lowry, south of Alameda." The testimony of Deweese totally confirms that at 0021:32 the plane was in fact "south of Lowry, south of Alameda." Looking out of the plane's left window, he saw Lowry's closed runways to

the east, and, while the final turn was in progress, he saw power lines along Alameda. Testimony in the record that the power lines along Alameda were underground was later cleared up and the government's brief disregards the clarification. The power lines immediately to the south of Lowry runway 35 on Alameda were underground, but the power lines along Alameda to the east and to the west of Lowry runway 35 were above ground. There was a gap in the above ground power lines on a projected line of Lowry's runway 35, but the rest of the power lines were above ground. Those were the power lines Deweese saw.

■ Shortly after 0015:32, Metro 201 accepted a surveillance approach. At that point, the plane was in the care and custody of the Air Traffic Controller, and the language of Judge Doyle in *Yates v. United States* (1974) 10 Cir., 497 F.2d 878 comes into play:

"It is familiar law that one in the care and custody of another where the circumstances deprive the person of an ordinary opportunity to protect himself has a right to expect that the person exercising the custody shall use reasonable care and caution for his protection."

That required reasonable care and caution wasn't exercised here, and Controller Phillips' failure to exercise reasonable care and caution was negligence which proximately caused the plane to crash. I think that what has been thus far said clearly establishes negligence, but there is more, and I shall briefly discuss the principal contentions of plaintiffs as to acts of negligence on the part of the controller.

■ Plaintiffs argue that it was negligence to offer a surveillance approach rather than an ILS approach in which more precise control could be exercised. Ordinarily, the acceptance or rejection of a surveillance approach is a decision for the pilot, but, as will be seen presently, his decision was unfairly impaired by the controller's failure to disclose essential facts which would enter into the pilot's decision. However, I am reluctant to say, and I do not hold that the failure to offer an ILS ap-

proach, standing alone, was negligence. But, this failure was coupled with the following omissions:—

1. The controller did not give adequate course guidance in accordance with the requirements of applicable regulations. [See, Exhibit 38, paragraph 729, and see, testimony of McDermott, p. 97.]

2. The controller failed to provide Metro 201 with the latest ceiling and visibility information and with the appropriate altimeter setting.

■ Prior to commencing its approach, Metro 201 received the weather information available on ADIS. This was standard procedure. After the approach was started, the pilot could not be expected to switch his radio back and forth from controller to ADIS to see if there was any weather change being broadcast on the ADIS channel. He was entitled to rely on and he did rely on the controller to advise him of weather changes. The ceiling changed from 400 feet to 300 feet during the approach, and this change was peculiarly vital information to a pilot on a surveillance approach. But, the ceiling change was not communicated to Metro 201, although even the chief of the Denver tower acknowledged that the weather change should have been provided by the controller. This failure to communicate was negligence, and it was a link in an unbroken chain of circumstances which proximately caused the accident.

Additionally, during the approach, there was an uncommunicated change in altimeter setting. The pilot was entirely dependent upon the controller for this information. The uncorrected altimeter caused the pilot to be 30 feet higher than his altimeter showed him to be. Thus, the two pieces of uncommunicated vital information—the lower ceiling and the altimeter correction—joined together to cause the missed approach, and, understandably enough, the tape transcript reads:

0018:46    AR-2    METRO TWO ZERO ONE, TWO SIX FOUR'S
                   THE HEADING, A MILE AND A HALF FROM
                   RUNWAY, DO YOU HAVE AIRPORT IN SIGHT?

0018:52    MET 201    NEGATIVE AIRPORT.

0018:53    AR-2    YOU HAVE THE AIRPORT?

0018:55    MET 201    NO AIRPORT.

---

At trial, Phillips acknowledged that when he asked the pilot if they had the airport in sight, Phillips thought that Metro 201 had broken through the ceiling, but the pilot had not been told what the true ceiling was and his altimeter was 30 feet off. This failure of communication was negligence which was a proximate cause of the accident.

3.  There was a failure on the part of the controller to give a proper missed approach procedure.

It is mandatory under the Air Traffic Control Manual [Exhibit 38] that specific missed approach procedures be communicated from the tower to the pilot before final descent is started. This was not done, and, in fact, it was some two and one-half minutes after the missed approach that any instructions were given. The pilot followed the published standard missed approach procedure. Controller Phillips urges that his 0019:07 communication of "TWO SIX SIX IS THE HEADING" was a missed approach procedure, but, if so, no pilot should be expected to so construe it, and McDermott fully confirms this. Phillips has not explained how he intended to handle the missed approach on the 266 heading, although an examination of the map will show that the path followed by the pilot under the normal missed approach procedure didn't vary all that much from a 266 heading. If Phillips' intent was to guide Metro 201 into Stapleton runway 35 from the 266 heading, the 0020:24 interruption by WAL 475 would have had the same effect it had on Metro 201 on the course flown by the pilot. *Ingham v. Eastern Airlines, Inc.* (1967) 2 Cir., 373 F.2d 227, holds:

"A missed approach required precision coordination by the crew, and the success or failure of the operation, when the plane was at a very low altitude, depended on just how rapidly the crew reacted. Thus, it was of the utmost importance that the crew not be lulled into a false sense of security. The pilot should have been told that weather conditions were becoming marginal, and that he might well encounter less than minimum visibility upon reaching the runway. This information would have signaled to the pilot that a missed approach might have to be executed."

█ And, here, the undisclosed information might well have caused the pilot to reject the surveillance approach and to opt for an ILS approach. I find and conclude that there was improper communication of missed approach procedure, and that this failure of communication constituted negligence which was a proximate cause of the crash, and I find and conclude that when all of the failures to communicate are added together, it was negligence not to affirmatively offer the ILS approach, albeit there is no usual duty to offer an ILS approach in the absence of a failure of the controller to properly communicate.

4.  The AR–2 Controller should have handed off all other traffic to give his undivided attention to Metro 201 after he learned of the engine failure.

█ Emergencies are covered in Chapter 6 of the Terminal Air Traffic Control Manual. [Exhibit 38] Paragraph 837 mandates that the controller, "Provide maximum assistance to aircraft in distress." Paragraph 839 requires the controller to "Coordinate

efforts to the extent possible to assist any aircraft believed overdue, lost or in emergency status." Phillips tried to handle Metro 201 with his radar on a 6–mile radius, but the commercial airlines planes had to be observed on radar with a 30–mile radius. Phillips said that he accomplished this by setting his own radar at 6 miles and watching the commercial flights on the AR–1 radar alongside which was set at 30 miles. Undeniably, Phillips could see both radar screens, but he should not have permitted his attention to be diverted from Metro 201 by trying to exercise control over the Continental, Western, and United Flights. The 0020:24 interruption by Western is the most glaring example of the inattention which resulted from the failure to hand off, but trying to read two radar screens at the same time, each on a different radius, under the emergency conditions then existing, cannot be said to represent compliance with Paragraph 837, to "provide maximum assistance to aircraft in distress." The failure to hand off was negligence, and it was a proximate cause of the accident.

Inevitably, with 400 pages of briefs there are charges of other acts of negligence on the part of defendant's agent, but I believe that the claims I have discussed represent the principal arguments of plaintiffs, and I do not discuss their other contentions, although in Phillips' defense, there was strong showing that the Denver Tower was under manned.

■ This brings us, then, to the question of contributory negligence charged against the pilot and co-pilot. Contributory negligence, of course, forms no part of the suit by Deweese. The government initially argues that the pilot has sole responsibility for a plane in flight, and, therefore, if the plane crashes, there is contributory negligence. The same argument was made in *Yates v. United States* (1974) 10 Cir., 497 F.2d 878, and it was rejected. It was said in *Yates:*

"In seeking a reversal the government, first, maintains that the trial court's finding and conclusion that the FAA controllers were negligent was clearly erroneous.

They rely on the fact that the regulations establish that each pilot is in command of and responsible for his own aircraft and has the final authority with respect to its operation, and that it is up to the pilot to exercise his own judgment as to existence of hazard and to refuse to accept instructions which he considers increase his peril. The government says that Yates was guilty of either sole or contributory negligence in flying into the wake turbulence area regardless of whether the government instructed him to follow the TWA 707 and that the local controllers were not guilty of negligence in failing to maintain proper separation between the 707 and the Cessna.

. . . . .

"The relationship between the air controller and the pilot of a plane which is landing or taking off creates a duty of care on the part of the controller. The government argues that plaintiff had no right to rely on instructions which the air controller gave him, and it was up to him to form his own judgment. We fail to see the controller's directions and warnings as being merely advisory. . . . We cannot, therefore, accept the view that the controllers with the complex equipment which they employ are there merely to give advice. The recognition of these functions as legal obligations gives rise to an attendant duty to perform these functions with reasonable care."

*Yates* is dispositive of the government's first argument in support of its claim of contributory negligence (and it is dispositive of most of the government's other arguments).

■ Next, the government urges that the pilots were negligent in leaving Laramie after the engine died on landing there. This argument is unsupported by opinion evidence in the record, and it ignores the testimony of Deweese that the engine operated normally between Laramie and the time Metro 201 was on its final approach to Stapleton. I find no contributory negli-

gence on the part of the pilot or co-pilot in failing to inspect the engine in Laramie or in taking off from Laramie.

Defendant then says that the pilot and co-pilot were negligent in the operation of the air controls, and that this alleged negligence caused the left engine to ice up. This is a bootstrap argument based upon a highly questionable examination of the plane after the crash, but the hard facts necessary to show that the air controls were in any way improperly used or set are impossible to glean from the evidence. Although Deweese wasn't fully acquainted with the controls on a Beech Queen Air, he saw the air controls being operated during the flight, and most importantly, he observed the temperature gauge. It was at 50° *Centigrade,* and to top this off, Deweese observed smooth manifold pressure drops of one inch when the controls were operated. Defendant has the burden of proving contributory negligence, and this burden was not met in support of any claimed improper air control operation. That being so, it becomes unnecessary to discuss any question of proximate cause or intervening cause in connection with the air control operation.

Defendant says that Metro 201 followed an erratic track on its approach to Stapleton. The only testimony in support of this contention is trial testimony of Phillips, but he didn't mention the erratic track at any time during his transmissions nor did he make mention of it in his official report. If the track was in fact erratic, the headings he gave are most difficult to explain, and McDermott's reconstruction of the path is not erratic. This reconstruction is supported in part by testimony of ground observers and of Deweese. More importantly, of course, if the track was erratic, Phillips' duty of undivided attention increased geometrically. The evidence in the case establishes that the track was not erratic, and it establishes that Metro 201 accepted and followed the headings given by the controller until the plane was about to stall when the belated 010 heading was directed.

I have already mentioned that if Phillips intended Metro 201 to fly a 266° course after the missed approach, he should have said so clearly. The negligence here was the controller's—not the pilots'. The pilots' adoption of the standard missed approach procedure in the absence of clear direction not to do so was not negligence.

In summation, I find no negligence on the part of the pilot or co-pilot in any respect.

In its brief, the government makes the eye-popping statement, "The flight crew had the last clear chance to land the aircraft at Lowry, as is evidenced by the testimony of Mr. Deweese and Mr. Johnson." Of course, last clear chance applies only when there is negligence on plaintiff's part, because it is a humanitarian doctrine to relieve negligent plaintiffs. It is not an escape hatch for a negligent defendant. *C. & S. R. Co. v. Western Light & Power Co.,* 73 Colo. 107, 214 P. 30; *Freeman v. Schulz,* 81 Colo. 535, 256 P. 631; *Bragdon v. Hexter,* 86 Colo. 435, 282 P. 568; *Owens v. U. S.,* 10 Cir., 194 F.2d 246; *Union Pacific R. Co. v. Ward,* 10 Cir., 230 F.2d 287; *Christopherson v. Humphrey,* 10 Cir., 366 F.2d 323. Moreover, even if the last clear chance doctrine were available to defendants, as is shown by the foregoing cases, the chance must be both last and clear. I doubt that the pilots had any realistic chance to land the plane at Lowry, but, if they did, their chance certainly was not clear.

I did indeed mention last clear chance at time of trial, but I did not mention it with any thought that the doctrine would be seized upon by defendant as an escape. Under the facts I have found, the doctrine is not applicable, but until I had studied the record, I thought that plaintiffs might want to rely on the doctrine. If I had accepted defendant's argument that the pilots were negligent in taking off from Laramie or that they were negligent in the operation of the air controls, I think that last clear chance would come into play, and I would have applied it. But, as to the government's claim of protection under last clear chance, I don't think that the doctrine applies to defendants, and I don't think that

the pilots had any last clear chance to avoid death.

The third party complaint was not seriously pressed at trial, and there is no evidence of negligence on the part of third party defendants. Judgment shall enter in favor of third party defendants and against third party plaintiff.

Having found negligence on the part of defendant which was a proximate cause of the deaths of the pilots and of the injuries to Deweese, and having found no contributory negligence on the part of the pilots, the cases must now be tried on the damage issues. Counsel are requested to advise of a time frame during which those issues can be tried and of the estimated trial time which will be required.